**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| **COLLEGIANS FOR A CONSTRUCTIVE TOMORROW-MADISON**, et al., | |
| Plaintiffs, | Case No. 09-CV-514 |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| The Regents of the University of Wisconsin System **CHARLES PRUITT**, et al. | |
| Defendants. | |

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT...................................................................................................................... 2

I.      CFACT Is Likely to Succeed on the Merits of its Claims ..................................... 2

        A.      Viewpoint Neutrality Is Required at All Levels of the GSSF Process .................... 3

        B.      The University Violated Viewpoint Neutrality by Denying Eligibility to CFACT,
                But Granting it to WISPIRG.................................................................................. 6

        C.      The University Violated Viewpoint Neutrality by Failing to Remedy the Blatant
                Viewpoint Discrimination of SSFC Member Szarzynski....................................... 8

        D.      The University Violated Viewpoint Neutrality by Relaxing Technical
                Requirements for Eligibility Applications for Most RSOs, But Not for CFACT .. 10

II.     CFACT and All Students Are Suffering Irreparable Harm ................................ 13

III.    The Balance of Hardships Tips Decidedly in CFACT's Favor ......................... 14

IV.     The Public Interest Favors the Grant of an Injunction....................................... 14

CONCLUSION................................................................................................................. 15

TABLE OF AUTHORITIES

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*,
    529 U.S. 217 (2000).................................................................................... 3, 4, 5, 10

*Christian Legal Soc'y v. Walker*,
    453 F.3d 852 (7th Cir. 2006...................................................................... 13, 14

*Elrod v. Burns*,
    427 U.S. 347 (1976).......................................................................................... 13

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)................................................................................. 10, 11, 13

*Gannett Co. v. DePasquale*,
    443 U.S. 368 (1979).......................................................................................... 15

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ......................................................................... 14

*Joelner v. Vill. Of Wa. Park*,
    378 F.3d 613 (7th Cir. 2004) .................................................................. 2, 13, 14

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967).......................................................................................... 15

*Nat'l People's Action v. Vill. Of Wilmette*,
    914 F.2d 1008 (7th Cir. 1990) ......................................................................... 13

*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*,
    523 F. 3d 668 (7th Cir. 2008) .......................................................................... 13

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)................................................................................ 2, 4, 8, 10

*Southworth v. Bd. of Regents of the Univ. of Wis. Sys.*,
    307 F.3d 566 (7th Cir. 2002) ......................................................... 4, 5, 6, 8, 10

*Winter v. Natural Res. Def. Council, Inc.*,
    129 S. Ct. 365 (2008)........................................................................................ 2

**INTRODUCTION**

The University of Wisconsin-Madison (University) promises students and their student organizations equal access to its student activity fee forum.  However, the University, the Associated Students of Madison (ASM) student government, and the Student Services Finance Committee (SSFC), which carry out University policy under the supervision of the chancellor, engaged in viewpoint discrimination when they refused to give Plaintiffs Collegians for a Constructive Tomorrow-Madison and William Merrick (hereinafter CFACT) access to the General Student Services Fund (GSSF) for the 2009-2010 academic year.

CFACT has received GSSF budgets for the past six years; it is not a new applicant for GSSF funding.  But this past year, the University denied GSSF eligibility to CFACT, and gave eligibility to its political counterpart, WISPIRG, even though both organizations provide the same service to students from different viewpoints.  In denying eligibility to CFACT, at least one member of the SSFC admitted that he voted against CFACT's eligibility because of the viewpoint it expresses.  Further, the SSFC required strict compliance with the eligibility bylaws from CFACT, but relaxed these same standards for nine other student organizations.  These actions, individually and collectively, demonstrate that the University unconstitutionally discriminated against CFACT's viewpoint in denying it access to the student activity fee forum.

As a result of the University's actions, CFACT is no longer permitted to access the GSSF speech forum for the 2009-2010 academic year, cutting off CFACT's funding and ability to speak in the forum, disabling its ability to provide its most important function to students—serving their needs to express their message about consumer and environmental issues, and requiring it to return all equipment purchased with GSSF money in prior budget years.  CFACT respectfully requests that the Court grant it immediate injunctive relief ordering the University to

1

grant CFACT GSSF eligibility for the 2009-2010 academic year, or, in the alternative, ordering the University to suspend its GSSF eligibility bylaws and re-consider CFACT's eligibility application based on new viewpoint neutral standards.

### ARGUMENT[1]

The University's discriminatory actions violate CFACT's First and Fourteenth Amendment rights to viewpoint neutral access to segregated fees.  CFACT is entitled to a preliminary injunction because it is likely to succeed on the merits, it is suffering irreparable harm, the balance of equities tips in its favor, and an injunction serves the public interest.  *Winter v. National Res. Def. Council, Inc*., 129 S. Ct. 365, 374 (2008).  Balancing these factors weighs heavily in favor of granting a preliminary injunction to protect CFACT's constitutional rights.

**I.     CFACT Is Likely to Succeed on the Merits of its Claims.**

Likelihood of success is often the determinative factor in preliminary injunction analysis. *Joelner v. Vill. of Wa. Park*, 378 F.3d 613, 620 (7th Cir. 2004).  CFACT is likely to succeed on the merits of its claims because it has been denied access to a public forum based on the viewpoint it wishes to express in that forum.  When the government opens a forum for private speech, as the University has done here with its segregated university fees, it must respect the boundaries of that forum, including the prohibition on viewpoint discrimination.  *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Id*. at 828.  Thus, "[f]or the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses."  *Id*. at 836.

---

[1] CFACT relies on the facts stated in its Statement of Proposed Facts filed with this Motion.

The University violated viewpoint neutrality in three distinct ways:  first, by denying CFACT eligibility but granting WISPIRG eligibility even though they provide the same services to students; second, by allowing at least one of the SSFC members to deny CFACT eligibility based on its expressive viewpoint; and third, by refusing to overlook alleged procedural deficiencies for CFACT, but exempting other registered student organizations (RSOs) that applied for GSSF eligibility from strict compliance.  Each of these actions, individually and collectively, violated CFACT's First and Fourteenth Amendment rights to viewpoint neutral access to segregated fees.

### A.  Viewpoint Neutrality Is Required at All Levels of the GSSF Process.

The University collects a mandatory segregated university fee from each student and uses a portion of that fee to fund student expression.  (Verified Compl. ("Compl.") ¶¶ 48-49, 51-54, 60-64; Pls.' Statement of Proposed Facts ("PSOPF") ¶¶ 11, 15.)  The purpose of the University's program is to "enhance the educational experience of its students by promoting extracurricular activities, stimulating advocacy and debate on diverse points of view, enabling participation in political activity, promoting student participation in campus administrative activity, and providing opportunities to develop social skills."  *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 223 (2000).

Mandatory student activity fee programs at public universities, like the one in this case, are free speech fora for students and are governed by public forum doctrine.  *Id.* at 229; *see Rosenberger*, 515 U.S. at 830 ("The SAF is a forum more in a metaphysical than in a spatial or geographical sense, but the same principles are applicable.").  Thus, when public universities collect a mandatory student activity fee, the distribution of those fees constitutes access to the forum and must be conducted on a viewpoint neutral basis.  *Southworth*, 529 U.S. at 233; *see*

3

*also Southworth v. Bd. of Regents of the Univ. of Wis. Sys.* (*Southworth II*), 307 F.3d 566, 573

(7th Cir. 2002) ("[S]tudents have a First Amendment interest in assuring that the University

administers the mandatory fee system in [a] manner ensuring viewpoint neutrality").

Universities that do not strictly comply with viewpoint neutrality may not require their students

to pay the fees because doing so violates the students' First Amendment rights. *Southworth*, 529

U.S. at 231.

The Supreme Court established the viewpoint neutrality requirement for student activity

fees programs in *Rosenberger*. In that case, Wide Awake Productions, a student organization at

the University of Virginia, applied for student activity fees to print a "magazine of philosophical

and religious expression." *Rosenberger*, 515 U.S. at 825. The student council denied Wide

Awake's request because the magazine was a "religious activity," which the funding guidelines

prohibited. *Id*. at 825, 827. The Supreme Court held that the university violated the First

Amendment's demand of viewpoint neutrality in government regulation of speech when it

prohibited student activity funds from being used for "religious activities." *Id*. at 837. "In the

realm of private speech or expression, government regulation may not favor one speaker over

another." *Id*. at 828.

Five years later, the Court reaffirmed the viewpoint neutrality principle. In *Southworth*,

which involved largely the same student activity fees system present in this case, the University

of Wisconsin required students to pay segregated university fees, a portion of which was

allocated to RSOs for their expressive activities. *Southworth*, 529 U.S. at 222-23. Several

students sued the university claiming that the segregated fee system violated their constitutional

right to be free from compelled speech because the fees went to groups that espoused messages

with which the plaintiffs disagreed. *Id*. at 221. The Supreme Court disagreed and held that the

4

university could require students to pay the fees if the fees were allocated to student organizations in a viewpoint neutral manner. *Id*. at 233. "Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance and for ensuring the integrity of the program's operation once the funds have been collected." *Id*.

The *Southworth* litigation did not end at the Supreme Court. After remand and a new appeal, the Seventh Circuit reviewed whether the fee system gave the student government unbridled discretion in deciding which student organizations were eligible for funding and how much funding they should receive. *Southworth II*, 307 F.3d at 568. The plaintiffs argued that the GSSF eligibility criterion that required RSOs to show how they provide an "identifiable educational service to the students of the University" was subjective and gave the SSFC unbridled discretion. *Id*. at 590. The Seventh Circuit held that constitutional prohibition on unbridled discretion of government decision-makers is a component of the broader viewpoint neutrality requirement mandated by the Supreme Court. *Id*. at 579. Nevertheless, the court found that the eligibility and funding criteria in use at that time did not give SSFC unbridled discretion in allocating the fees because of the procedural safeguards implemented by the University. *Id*. at 587-88. Although the Seventh Circuit found that these procedural safeguards and the appeals process reduced the likelihood of veiled viewpoint discrimination, it warned that an as-applied challenge could demonstrate viewpoint discrimination.

In *Southworth II*, the Seventh Circuit also anticipated specific university actions that would violate the principle against viewpoint discrimination, and it accurately predicted the very things that happened to CFACT in this case:

> Moreover, as the University admitted at oral argument, *if the SSFC or the ASM Finance Committee were to treat one RSO's speech and expressive activities as a student service, but conclude that another RSO's speech and expressive conduct did not constitute a student service, that would constitute proof of*

5

> *viewpoint discrimination*. Such viewpoint discrimination would support an as-
> applied challenge by either the RSO that was denied funding or an individual
> student required to pay the mandatory student fee.

*Id*. at 590 (emphasis added).   Further, the court recognized that if two groups with similar structure, activities, goals and budgets applied for funding and one received a lesser amount, that would be evidence of viewpoint discrimination:

> Or, finally, if one RSO applied for funding following the blueprints of another
> RSO, i.e., similar organizational structure, similar types of activities, similar
> goals, and similar budgets, but received a lower amount of funding, either the
> RSO or any student who paid the mandatory student activity fee could present an
> as-applied challenge in court.

*Id*. at 591.   CFACT presents the exact facts in its as-applied challenge that the Seventh Circuit declared would be evidence of viewpoint discrimination.

**B.  The University Violated Viewpoint Neutrality by Denying Eligibility to CFACT, But Granting it to WISPIRG.**

The University engaged in viewpoint discrimination when it granted GSSF eligibility to WISPIRG, but denied it to CFACT, even though both groups provide the same "service" to students.  *Id*. at 590.   CFACT is a public interest student organization built upon using free market principles to advocate and implement environmental and consumer change on the University's campus.  (Compl. ¶ 82; PSOPF ¶ 38.)  The founders of CFACT at the University are former WISPIRG members who found that WISPIRG did not represent their viewpoint on environmental and consumer issues.  (Compl. ¶¶ 83-85; PSOPF ¶¶ 39-42.)  WISPIRG is also a public interest student organization that seeks to advocate and implement change on environmental and consumer issues, but it does so from a politically liberal perspective.  (Compl. ¶¶ 83, 94; PSOPF ¶¶ 40, 50.)  As a result, these individuals created CFACT as a direct response to WISPIRG's viewpoint, ensuring that University students would have a choice in philosophies and approaches to environmental and consumer advocacy.  (Compl. ¶¶ 83-86; PSOPF ¶¶ 39-42.)

CFACT and WISPIRG both previously received GSSF budgets, and both groups re-applied for GSSF eligibility in the fall of 2008.  (Compl. ¶ 98; PSOPF ¶ 55.)   CFACT's application stated that its "campaigns" allow students to get involved in campus activities to contribute to the discussion of consumer and environmental issues.  (Compl. Ex. 7; *see* Compl. ¶¶ 87-93; PSOPF ¶¶ 43-49.)   The campaigns are run by students and seek to cause environmentally friendly change on campus, from a free market perspective.  (Compl. ¶¶ 82, 90; PSOPF ¶¶ 38, 46.)  Any University student can come to CFACT with a new campaign idea and the CFACT participants will vote on whether to implement it.        (Compl. ¶ 92; Compl. Ex. 7 at 4 of 10; PSOPF ¶ 48.)

Similarly, WISPIRG's GSSF Eligibility Application stated that its service to University students was its campaigns.  (Compl. Ex. 11 ¶ 10; Compl. ¶¶ 94-95, 128; PSOPF ¶¶ 50-52, 87.) Students could "request from them the ability to advocate on an issue of concern and that the organization would take that into consideration and go forth and advocate on it."[2]  (Compl. Ex. 11 ¶ 10c; *see* Compl. ¶ 128; PSOPF ¶ 87.)   Students access this service by participating in WISPIRG's campaigns and proposing new campaign ideas (Compl. Ex. 11 ¶ 10c; Compl. ¶ 128; PSOPF ¶ 87), which is virtually identical to CFACT's service of providing campaigns and means for students to advocate ideas (Compl. ¶¶ 90-91; PSOPF ¶¶ 46-47).

The SSFC granted eligibility to WISPIRG for a GSSF budget.  (Compl. Ex. 11 ¶ 10; Compl. ¶¶ 126-28; PSOPF ¶¶ 87-88.)  But even though CFACT provides the same service from a different perspective, the SSFC refused to grant eligibility to CFACT.  (Compl. ¶ 118; PSOPF

---

[2] SSFC initially granted WISPIRG eligibility on the grounds that its service was to provide a means for "participation in the organization and a forum for political involvement." (Compl. Ex. 11 ¶ 10a.)  However, SSFC members later decided that this contradicted the eligibility criteria, revisited WISPIRG's eligibility and decided that its campaigns were its direct service. (*Id*. ¶ 10c.)  As a result, WISPIRG was granted GSSF eligibility. (*Id*. ¶ 10.)

¶ 79.)  CFACT appealed the denial of its eligibility through all avenues of the ASM, including the Student Judiciary, and to Defendant Martin, but the University denied its appeals at every level.  (Compl. ¶¶ 135-38, 145; PSOPF ¶¶ 92-98, 104-05.)

By denying GSSF eligibility to CFACT, the University committed the same actions it *admitted* would be evidence of viewpoint discrimination in *Southworth II*, 307 F.3d at 590.  The University applied the same eligibility criteria to both CFACT and WISPIRG, which requires, in part, that an RSO show that it provides a "direct service" to students.  (Compl. ¶¶ 72-73; PSOPF ¶¶ 32-33.)  However, the University determined that "one RSO's speech and expressive activities [are] a student service, but conclude[d] that another RSO's speech and expressive conduct [do] not constitute a student service."  *Southworth II*, 307 F.3d at 590.  According to the Seventh Circuit and the University's admission at oral argument, this constitutes "proof of viewpoint discrimination."  *Id*.  The University has clearly discriminated against CFACT based on its viewpoint.  CFACT is entitled to immediate injunctive relief.

**C.  The University Violated Viewpoint Neutrality By Failing to Remedy the Blatant Viewpoint Discrimination of SSFC Member Szarzynski.**

It is axiomatic that the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger*, 515 U.S. at 829.  "The State may not . . . discriminate against speech on the basis of its viewpoint."  *Id*. (citations omitted).  The University disregarded this mandate when Defendant and SSFC member Kyle Szarzynski admitted in a blog entry that he voted against CFACT's GSSF Eligibility Application because he dislikes the viewpoint expressed by the group.  (Compl. ¶ 134; PSOPF ¶ 90.)

On September 22, 2008, Szarzynski voted to deny CFACT eligibility because he believed

8

that CFACT did not provide a specific and identifiable direct service pursuant to ASM Bylaw 2.032(3)(c)2c. (Compl. ¶ 122; Compl. Ex. 9; PSOPF ¶ 83.) Defendant Szarzynski believed that CFACT's campaigns were the focus of the group, but were comprised of a series of events, which he believed do not constitute a "service." (Compl. ¶ 122; PSOPF ¶ 83.) Defendant Szarzynski, however, voted to grant eligibility to WISPIRG, even though their main focus was similar campaigns. (Compl. ¶ 123; Compl. Ex. 10 ¶ 4; PSOPF ¶ 84.)

After the Student Judiciary denied CFACT's eligibility appeals, on November 21, 2008, Defendant Szarzynski wrote a blog entry on a blog entitled, "Forward Thinking, The Collaborative Blog Of Madison's Progressive Students." (Compl. ¶¶ 130, 133; Compl. Ex. 12; PSOPF ¶ 90.) In the post, titled "CFACT Denied! Again!," he stated that he was pleased CFACT lost its appeal and would not get GSSF eligibility:

> Tonight, SJ [Student Judiciary] dismissed CFACT's second appeal over their eligibility decision, all but ensuring the death of the group on campus as we currently know it. ***Good riddens [sic] to an awful organization, one whose accomplishments include bringing Ted Nugent to campus, fawning over nuclear power, denying the existence of global warming and f[\*\*\*]ing with student-controlled finances throughout the country. It's convenient that this do-nothing, country club, crazy right-wing group also didn't meet the eligibility criteria for GSSF funding, the reason for their denial and agreed on by EVERY member of the SSFC.***

(Compl. Ex. 12 (emphasis added).) Not only did Defendant Szarzynski reveal his hostility toward CFACT's viewpoint, he inferred that every member of SSFC agreed with his discriminatory appraisal of the group. Szarzynski voted to grant WISPIRG eligibility. (Compl. ¶ 123; PSOPF ¶ 84.)

Defendant Szarzynski—and by extension of his office—ASM, violated viewpoint neutrality when he denied CFACT GSSF eligibility because of the message it expresses on campus. Government officials like Defendant Szarsynski violate the First Amendment when they exclude speakers from a speech forum based on the viewpoint of their speech.

9

*Rosenberger*, 515 U.S. at 829.  The "government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression."  *Id*.  Further, "when the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  *Id*. at 829.  Szarzynski's viewpoint discrimination is evident in his determination that WISPIRG's campaigns qualified it for GSSF funding but CFACT's campaigns did not.  *Southworth II*, 307 F.3d at 590-91.  But his discrimination is also made plain by his obviously hostile implication that he denied CFACT eligibility because of its viewpoint.  Based on this unconstitutional viewpoint discrimination, CFACT is entitled to injunctive relief.

**D. The  University  Violated  Viewpoint  Neutrality  By  Relaxing  Technical Requirements for Eligibility Applications for Most RSOs, But Not for CFACT.**

The GSSF is a public forum designed to allow students to speak through their RSOs. *Southworth*, 529 U.S. at 229; *Rosenberger*, 515 U.S. at 830.  As the Seventh Circuit found in *Southworth II*, "the same principles which apply to governmental regulations of parks, sidewalks and streets through permit and licensing schemes also apply to the University's forum of money established by its mandatory fee system."  *Southworth II*, 307 F.3d at 580.

Access to the GSSF is controlled by the eligibility process, which is a licensing process through which the ASM's SSFC and the University determine whether an RSO will be able to access the forum.  *Id*.  In such a process, "the Constitution prohibits the government from providing decisionmakers with unbridled discretion for granting access to the forum."  *Id*.; *see Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (finding that the government may regulate the use of public forums through permits, but that such schemes "may not delegate overly broad licensing discretion to a government official").

10

The danger of giving government officials—especially college students on ASM committees—unbridled discretion in licensing speakers is that they will naturally engage in viewpoint discrimination. "If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Forsyth County*, 505 U.S. at 131 (citations and internal quotations omitted). The end result of licensing schemes that allow for unbridled discretion is that "[n]othing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees" or eligibility decisions. *Id*. at 133.

The SSFC violated viewpoint neutrality by using the overly broad GSSF eligibility criteria to deny CFACT eligibility, in part, because its application was allegedly "missing" a few pages. The ASM Bylaws provide that an RSO that submits a GSSF eligibility application must "have completed the eligibility application." (Compl. Ex. 5 at ASM Bylaw 2.032(3)(c)3(3).) Sometime between the time that CFACT turned in its application and the SSFC's review of CFACT's application at the eligibility hearing, the SSFC lost a few pages of CFACT's End of Year Report (EOYR). (Compl. ¶¶ 102-105, 107, 111-12; PSOPF ¶¶ 69-62, 64, 68-72.) However, CFACT turned in a complete GSSF eligibility application, as no less than four of its members testified to. (Compl. ¶¶ 102, 105-07; Decl. of Alyssa Hext, Aug. 6, 2009, ¶¶ 11-19; PSOPF ¶¶ 69-64, 69-70.) This is evident by the fact that the other portions of CFACT's application referred to information and data compiled on the allegedly "missing" pages. (Compl. ¶ 112; Hext Decl. ¶¶ 7-10; PSOPF ¶¶ 71-72.)

Once the SSFC made CFACT aware that it was missing some pages of the EOYR, CFACT's president produced those pages within five minutes by printing off new, full copies of

11

the entire application, which included the allegedly "missing" pages. (Compl. ¶ 112; PSOPF ¶ 71.) Although SSFC and the University were in sole custody of the application materials during the eligibility period, and there was no evidence supporting the conclusion that CFACT's application was not complete when it was turned in (Compl. ¶¶ 113-15; PSOPF ¶¶ 73-74), the SSFC blamed the missing pages on CFACT and pursuant to ASM Bylaw 2.032(3)(c)3(3) found that CFACT did not complete the Eligibility Application (Compl. ¶¶ 119-20; PSOPF ¶¶ 80-81).

Even though the SSFC required CFACT to strictly comply with the bylaws, it allowed other GSSF eligibility applicants to submit incomplete applications without penalty. (Compl. ¶ 116; PSOPF ¶ 77.) CALS Student Council, Engineers without Borders, F.H. King, Legal Information Center, Student Leadership Program, Sex Out Loud, WISPIRG, Wunk Sheek, and WSUM Radio did not submit "Students Served Budget Tracking Form[s]" as required by the GSSF Eligibility Application, but these groups were not denied GSSF eligibility based on missing documents. (Compl. ¶ 117; Compl. Ex. 8; PSOPF ¶ 78.) The SSFC overlooked the requirements for these groups, even though they claimed that CFACT's "missing" pages were a sufficient reason to deny it eligibility.

Bylaw 2.032(3)(c)3(3) gives SSFC unbridled discretion because it does not define what must be included in the eligibility application and when exceptions will be made for RSOs whose applications are incomplete. Here, the government officials—ASM's SSFC—decided in its sole, unfettered discretion to apply the bylaws strictly against some RSOs, but not others. As a result, SSFC required strict compliance with the bylaws from CFACT, but not from at least nine other RSO applicants. Such unbridled discretion in licensing speakers is not tolerated under the First Amendment. When this discretion is considered in conjunction with SSFC's other viewpoint discriminatory actions against CFACT, it is evident that SSFC's demand for strict

compliance from CFACT was veiled viewpoint discrimination. *Forsyth County*, 505 U.S. at 131. Based on these actions, CFACT is entitled to injunctive relief.

## II. CFACT-Madison and All Students Are Suffering Irreparable Harm.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted); *see also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 669 (7th Cir. 2008); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). Defendants have violated Plaintiffs' First and Fourteenth Amendment rights. Nothing but injunctive relief will restore the loss of Plaintiffs' rights to freedom of speech and due process of law, namely access to the segregated fee forum. *Joelner*, 378 F.3d at 620; *see Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (noting that injunctions are appropriate in First Amendment cases).

CFACT has no adequate remedy at law and is suffering irreparable injury. CFACT is in imminent danger of losing all of its office equipment that was purchased with GSSF funds in previous years. (PSOPF ¶ 113.) The loss of this equipment will disable it from having any means to support its campaigns. But even more serious, by being excluded from the GSSF speech forum, CFACT is without any funding to provide students with its vital service—an avenue to express their viewpoints on consumer and environmental issues. (PSOPF ¶ 112.) As a result, students are left with one choice, WISPIRG, which is really no choice if they want to express a viewpoint on environmental and consumer issues. The exclusion of CFACT from the GSSF forum violates its freedom of speech and prevents it from contributing to and balancing the campus dialogue on these issues. The suppression of CFACT's speech constitutes irreparable injury for which there is no adequate remedy at law. *Joelner*, 378 F.3d at 620.

13

### III.    The Balance of Hardships Tips Decidedly in CFACT's Favor.

When evaluating "the irreparable harm that [Plaintiffs will] endure without the protection of the preliminary injunction against any irreparable harm [Defendants] would suffer if the court were to grant the requested relief," it becomes clear that the hardships tip decidedly in favor of granting Plaintiffs injunctive relief. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).  In making this determination courts "employ[] a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id*. (citations and internal quotation marks omitted).

The University is violating CFACT's First and Fourteenth Amendment rights to free expression, due process and viewpoint neutral access to segregated fees.  These violations will continue as long as Defendants' viewpoint discriminatory policies and actions remain unrestrained.  Defendants lack a compelling interest to restrict CFACT's freedoms.  Their policies and actions violate the First and Fourteenth Amendments in multiple ways, such that the requested injunction will not impose any hardship on them.  *See Joelner*, 378 F.3d at 620 ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute. . . .").  In contrast, CFACT is suffering irreparable harm that outweighs any possible harm an injunction might impose on Defendants.

### IV.    The Public Interest Favors the Grant of an Injunction.

Courts, including those in this Circuit, consistently hold that the public interest is best served when the Constitution is upheld and First Amendment principles are protected by preliminary injunction.  *Walker*, 453 F.3d at 859 (citing *Joelner*, 378 F.3d at 620).  The Supreme Court has also held that preventing the violation of a party's constitutional rights is in the public

14

interest.  *See Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979).  In this case, the public interest will best be served by the suspension, rather than the continuation, of the Defendants' viewpoint discriminatory eligibility decision.   An injunction upholding fundamental constitutional rights will restore the "marketplace of ideas" to the University, and protect the critical values of free speech, public discourse, and open intellectual inquiry free from government exclusion.  *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).  The public interest favors granting CFACT injunctive relief.  Thus, all relevant factors support granting CFACT's motion for preliminary injunction.

## **CONCLUSION**

The University committed the exact act of viewpoint discrimination that the Seventh Circuit predicted could happen in a student activity fee system.  The University denied CFACT eligibility to participate in the GSSF forum because its campaigns allegedly do not constitute a "service," while at the same time giving CFACT's politically liberal counterpart, WISPIRG, GSSF eligibility even though it provides a virtually identical service to students.  An SSFC member even conceded that he voted against CFACT because of its expressive viewpoint.  And SSFC required stricter compliance with ASM bylaws from CFACT than it did with other eligibility applicants.  These actions and decisions, both individually and collectively, constitute impermissible viewpoint discrimination against CFACT.  As a result of these actions, CFACT is no longer able to gain equal access to GSSF funds to express its message on campus and is being forced to return its office equipment.  Only immediate injunctive relief will restore CFACT's constitutional rights.   CFACT respectfully requests that the Court granted its Motion for Preliminary Injunction.

15

Respectfully submitted this 20th day of August, 2009,

/s/David J. Hacker

DAVID J. HACKER
California Bar No. 249272
Illinois Bar No. 6283022
HEATHER GEBELIN HACKER
California Bar No. 249273
Arizona Bar No. 024167
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932–2850
(916) 932-2851—facsimile
dhacker@telladf.org
hghacker@telladf.org

DAVID A. FRENCH
Tennessee Bar No. 16692
Kentucky Bar No. 86986
ALLIANCE DEFENSE FUND
12 Public Square
Columbia, Tennessee 38401
(931) 490–0591
(931) 490–7989—facsimile
dfrench@telladf.org

JORDAN W. LORENCE
Minnesota Bar No. 125210*
ALLIANCE DEFENSE FUND
801 G Street, NW
Suite 509
Washington, DC 20001
(202) 393-8690
(202) 347–3622—facsimile
jlorence@telladf.org

KRYSTAL WILLIAMS-OBY
Wisconsin Bar No. 01019584
10 East Doty Street, Suite 800
Madison, Wisconsin 53703
(608) 204-5896
(608) 441-5707—facsimile
kingdomlegal@sbcglobal.net

*Application for admission submitted under
separate cover.

ATTORNEYS FOR PLAINTIFFS

16

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2009, I electronically filed the foregoing paper with the Clerk of Court using the CM/ECF system, and I hereby certify that the foregoing document will be served on the defendants as soon as possible along with the Summons, Complaint, and standard attachments for Judge Barbara B. Crabb required to be served on all parties.

s/David J. Hacker
DAVID J. HACKER
California Bar No. 249272
Illinois Bar No. 6283022
ALLIANCE DEFENSE FUND
101 Parkshore Drive, Suite 100
Folsom, California 95630
(916) 932–2850
(916) 932-2851—facsimile
dhacker@telladf.org
hghacker@telladf.org