# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

---

**COLLEGIANS FOR A CONSTRUCTIVE**
**TOMORROW – MADISON,**
        **Plaintiff,**

    **v.**                           **Case No. 09-C-0514**

**THE REGENTS OF THE**
**UNIVERSITY OF WISCONSIN**
**SYSTEM, et al.,**
        **Defendants.**

---

## <u>DECISION AND ORDER</u>

Plaintiff Collegians for a Constructive Tomorrow-Madison ("CFACT"), a student organization at the University of Wisconsin-Madison ("the University"), filed this action pursuant to 42 U.S.C. § 1983 against the Regents of the University of Wisconsin System, the Chancellor of the University, and members of the University's student government. Plaintiff contends that defendants violated its members' First Amendment rights by denying it equal access to the University's student activity fee forum.  Before me now is plaintiff's motion for a preliminary injunction.

## I.  BACKGROUND

Plaintiff's claim stems from a line of cases dealing with programs designed to facilitate extracurricular student speech at a public university.  <u>See, e.g.</u>, <u>Bd. of Regents of the Univ. of Wis. Sys. v. Southworth</u>, 529 U.S. 217 (2000).  Under these cases, a public university may require its students to pay student-activity fees to fund student organizations that engage in political and ideological speech only if it allocates the funds on a viewpoint-

neutral basis.  Id. at 221.  Thus, a university may not use mandated student fees to fund a student organization espousing a progressive viewpoint on a topic but decline to fund an organization supporting a conservative viewpoint.

The present case involves the student-fee program at the University of Wisconsin-Madison.  Each term, the University requires students to pay a "segregated university fee."  The University then divides the resulting fund into "allocable" and "nonallocable" fees.  The student government, the Associated Students of Madison ("ASM"), allocates the allocable fees to student organizations in consultation with the chancellor and subject to the final approval of the Board of Regents.  Allocable fees provide substantial support for campus student activities and services, including operations, activities and programs of "registered student organizations" ("RSOs").

ASM allocates fees to RSOs through different funding channels, one of which is the General Student Services Fund ("GSSF"), which funds RSOs that provide non-academic but educational services to students.  Although the GSSF funds diverse RSOs, typical recipients include the University's radio station and a tutoring service.

An ASM committee, the Student Services Finance Committee ("SSFC"), has primary responsibility for allocating GSSF funds.  An RSO seeking GSSF funding must apply to SSFC by submitting an eligibility application.  The ASM in consultation with the chancellor promulgates eligibility criteria and publishes them as ASM bylaws.  Several such bylaws are relevant to the present case.  First, pursuant to ASM Bylaw 2.032(3)(c)3, the RSO must meet the following "General Requirements" for eligibility:

1)    The group must be an RSO
2)    The group must have written governing documents

3)   The group must have completed and submitted the eligibility application by the deadline set by the SSFC

4)   A representative of the group must attend the scheduled eligibility hearing

5)   University students must be the principal focus of the group's programming

6)   University students must be the principal beneficiaries of the group's programming.

Second, pursuant to ASM Bylaw 2.032(3)(c)5, the RSO must meet the following "Direct Service" requirements:

1)   The group must provide to the students of the university a specific and identifiable direct service, as defined by ASM Bylaw 2.032(3)(c)2c

2)   The group must provide a written mission statement outlining the group's direct service(s)

3)   The direct service(s) provided must be the primary focus of the group

4)   The direct service(s) of the group must be aimed at reaching all university students

5)   University students must be the principal focus of the group's direct service(s)

6)   University students must be the principal beneficiaries of the group's direct service(s)

7)   The group must demonstrate that the university does not provide a substantially equivalent direct service(s)

8)   The direct service(s) must be educational, but cannot be a credit producing activity.

ASM Bylaw 2.032(3)(c)2c defines the "direct service" required by the above bylaw as follows:

Direct service means any program offered by the group which possesses all of the following characteristics:

1)   The program must be available on request by recipients

2)   The program can be tailored subject to the needs of the recipients within the mission of the group

3)   The program must be accessible to the recipients regardless of the recipients's participation and/or membership in the group

4)   The program must be available to recipients continually throughout the course of the fiscal year

5)   The program is not an individual event, series of events, publication, or a leadership development opportunity for group member(s).

3

If the RSO is granted eligibility pursuant to the above criteria, the RSO must then submit an application to SSFC requesting approval of its budget for the year.

SSFC makes GSSF eligibility and funding determinations one year in advance of the academic year in which the funds will be used.  Thus, during the fall of 2008, SSFC reviewed GSSF eligibility and funding applications for the 2009-10 academic year.  RSOs that are found GSSF eligible retain that status for two consecutive academic years. However, an RSO must submit a funding application every year.  Once an RSO is granted GSSF eligibility and its budget for the year is approved, the RSO can begin making expenditures.  The RSO receives its allocated GSSF funds in the form of reimbursements for specific expenses, not as a lump sum at the beginning of the year.

In 2002, SSFC granted GSSF eligibility and funding to plaintiff, which describes itself as a "non-profit, non-partisan, student-run advocacy group at UW-Madison that gives students the opportunity to participate in research, advocacy and development of public policy involving environmentalism and other social concerns."  (Pl.'s Prop. Findings of Fact ¶ 38.) Plaintiff "believes that most consumer and environmental problems can best be met and overcome through the power of the free enterprise system and the ingenuity of science and technology."  (Id.)  CFACT states that it was founded as a direct response to WISPIRG, an RSO that CFACT believes takes a "liberal viewpoint" on environmental issues.  (Id. ¶ 40.)  Although CFACT does not label its viewpoint as "conservative," I assume that I may fairly characterize it as such.

In the fall of 2008, to preserve its GSSF eligibility for 2009 through 2011, CFACT prepared a GSSF-eligibility application.  Pursuant to SSFC rules, the application was due by noon on August 18, 2008 and could be submitted via email or in person.  On the

4

morning of August 18, 2008, CFACT members James Hill and Alyssa Hext hand-delivered CFACT's eligibility application to SSFC's office.  The office was not staffed when they arrived, and they left the application in a cardboard box with a sign on it indicating that GSSF-eligibility applications should be left in the box.  CFACT did not transmit an electronic copy of its application to SSFC.

At hearings held on September 18, 2008 and September 22, 2008, SSFC considered CFACT's eligibility for GSSF funding.  The members of SSFC present at these hearings were defendants Carl Fergus, Joseph French, Kurt Gosselin and Kyle Szarzynski.  Before the start of the September 22nd meeting, Gosselin (the committee chair) advised Hill that three pages were missing from CFACT's eligibility application.  These three pages were part of the "end-of-year report" that RSOs which had received GSSF funding in the past were required to attach to their application.  Gosselin advised Hill to print copies of the missing pages if he had them, and Hill left the room and returned with the missing pages.

During the meeting, several committee members expressed concern about the missing pages.  As noted above, one of the general requirements for GSSF eligibility is that "[t]he group must have completed and submitted the eligibility application by the deadline set by the SSFC."  Also, when an SSFC member votes on an RSO's eligibility, he or she must complete a form entitled "SSFC Eligibility Evaluation."  (See Compl. Ex. 9 (completed SSFC Eligibility Evaluations for CFACT).)  This form contains a series of yes/no questions, one for each eligibility criterion.  If the committee member answers "no" to any question, the member must vote against eligibility (or abstain).  If the member answers "yes" to all questions, he or she must vote in favor of eligibility (or abstain).  One of the questions is whether the RSO submitted a completed eligibility application.  Another is whether the

5

RSO submitted its end-of-year report on time. The SSFC members who were concerned about the pages missing from CFACT's end-of-year report were trying to determine whether CFACT had satisfied the requirement that it timely submit a complete eligibility application and end-of-year report.

As the debate proceeded, two SSFC members, Fergus and French, asked Gosselin whether CFACT had turned in the missing pages on time along with the rest of its application.[1] Gosselin stated that he could not confirm that CFACT had turned them in on time but added that CFACT's members had stated that they turned them in with the rest of CFACT's application. Szarzynski stated that if SSFC could not conclusively determine that the missing pages had not been turned in on time, it should give CFACT the benefit of the doubt and conclude that it had timely submitted a complete application. Fergus and French indicated that they believed that they were required to find that CFACT had not timely submitted a completed eligibility application because they had previously refused to accept untimely application materials from another RSO. Another SSFC member, Zorian Lasowsky, expressed the opinion that CFACT had not submitted a timely end-of-year report or a completed application. When they recorded their findings on the SSFC Eligibility Evaluation, Fergus, French and Lasowsky answered "no" to the question whether CFACT had submitted a complete application, and Szarzynski answered "yes."

In addition to debating whether CFACT had submitted a complete application, SSFC debated whether CFACT satisfied the "direct service" requirements for GSSF eligibility. The issue was whether CFACT provided a direct service to students who were not

---

[1]Partial transcripts of the SSFC hearings concerning CFACT's eligibility are attached as exhibits to the Affidavit of Bruce Olsen.

6

members of CFACT, and if so, whether that service was the group's primary focus. Committee members expressed confusion about the nature of CFACT's purported direct service, whether the service was available to non-members of CFACT, and the extent to which non-member students would benefit from it.[2]  Fergus and Lasowsky ultimately concluded that CFACT did offer a direct service to non-member students but that the service was not CFACT's primary focus.  Szarzynski and French concluded that CFACT did not offer a direct service to non-members.

Based on its findings that CFACT had not submitted a complete application and did not meet the direct service requirements, SSFC denied CFACT GSSF eligibility. Szarzynski, French and Fergus voted against eligibility, and Lasowsky abstained.  At the next SSFC meeting, members discussed reconsidering CFACT's eligibility application. French stated that after speaking with members of CFACT he had a better understanding of CFACT's direct service and might be inclined to find that CFACT did meet the direct service requirements.  However, he stated that because he still believed that CFACT had not submitted a complete application on time, he would not vote to grant eligibility to CFACT.  He reiterated that he had voted against accepting untimely application materials from another group and that therefore he should not vote in favor of accepting untimely materials from CFACT.  Szarzynski and Fergus both stated that they stood by their original

---

[2]In this court, CFACT states that its "primary service is to supplement every students' classroom education with real world knowledge about environmental issues that can be applied across a wide variety of viewpoints and ideas." (Pl.'s Prop. Findings of Fact ¶ 43.)  CFACT then states that it provides this service through volunteer and internship programs, as well as campaigns.  (Id. ¶¶ 44-49.)  Although CFACT does not state that students who are not members of CFACT may access the volunteer and internship programs, it does state that non-members can participate in CFACT's campaigns.  (Id. ¶ 48.)

findings and would not change their votes.  Lasowsky indicated that he was inclined to reconsider his finding that CFACT did not provide a direct service and was equivocal about the issue of the incomplete application.  He attempted to move for reconsideration, but because he had abstained from the original vote, could not make that motion.  French then observed that even if the committee reconsidered whether CFACT met the direct service requirements, CFACT would still be ineligible based on its failure to timely submit a complete application.  He thus moved to close the debate, and without objection, debate was closed.

After this meeting Lasowsky, French and Fergus sent materials to the committee chair further explaining the reasoning for their votes.  Lasowsky stated that he was satisfied that CFACT met the direct service requirements for GSSF eligibility but did not say whether he would have changed his finding as to the completeness of CFACT's application or whether he would have changed his vote from "abstain" to "aye."  French stated that since he voted on CFACT's eligibility he had concluded that CFACT provided a direct service to students but that he  was not convinced that such service was CFACT's primary focus.  He added that he continued to believe that CFACT had not timely submitted a complete application and thus would not have changed his vote from "nay" to "aye."   Fergus reiterated his view that while CFACT provided a direct service, such service was not its primary focus.

CFACT appealed SSFC's decision to ASM's student judiciary, which is empowered to interpret ASM's bylaws and ensure that they are applied in a viewpoint-neutral manner. CFACT argued that SSFC denied it funding based on its viewpoint, that SSFC negligently misplaced the three pages missing from its end-of-year report, and that even if SSFC had

correctly determined that the end-of-year report was late it should have accepted the report because it had accepted other late reports. A panel of three justices heard CFACT's complaint and concluded that SSFC's decision was viewpoint neutral, that SSFC had not negligently misplaced the missing pages, and that SSFC had not accepted late application materials from other groups. CFACT appealed the panel's decision to the full student judiciary, but that appeal was summarily denied.

After the full student judiciary denied CFACT's appeal, Szarzynski wrote an entry on a blog entitled "Forward Thinking: The Collaborative Blog of Madison's Progressive Students." In it, he stated:

> Tonight, [the student judiciary] dismissed CFACT's second appeal over their eligibility decision, all but ensuring the death of the group on campus as we currently know it. Good riddens [sic] to an awful organization, one whose accomplishments include bringing Ted Nugent to campus, fawning over nuclear power, denying the existence of global warming and fucking with student-controlled finances throughout the country.
>
> It's convenient that this do-nothing, country club, crazy right-wing group also didn't meet the eligibility criteria for GSSF funding, the reason for their denial and agreed on by EVERY member of the SSFC.

(Compl. Ex. 12.)

CFACT appealed the denial of its GSSF eligibility to Chancellor Carolyn "Biddy" Martin, again arguing that SSFC's decision was not viewpoint neutral, that SSFC negligently misplaced the pages missing from its end-of-year report, and that SSFC had previously accepted untimely application materials from other groups. Chancellor Martin first noted that groups could not appeal issues unrelated to viewpoint neutrality to her. She then found that the issue of whether CFACT timely submitted a complete application did not implicate viewpoint neutrality and thus was not properly before her. She then ruled that

9

she need not decide CFACT's claim of viewpoint discrimination because regardless of her ruling, she could not upset SSFC's finding that CFACT had not timely submitted a complete application. She then dismissed the appeal, leaving the decision to deny CFACT's application for GSSF eligibility intact.   This lawsuit ensued, and plaintiff immediately moved for a preliminary injunction requiring defendants to grant it GSSF eligibility for the 2009-10 academic year.

## II.  DISCUSSION

When confronted with a motion for a preliminary injunction, a district court proceeds in two distinct phases: a threshold phase and, if necessary, a balancing phase. Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1085-86 (7th Cir. 2008). To survive the threshold phase, a party seeking a preliminary injunction must establish three elements:  first, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims.  Second, that traditional legal remedies would be inadequate.  And third, that its claim has some likelihood of succeeding on the merits. Id. at 1086.  If the court determines that the movant fails to establish any of these elements, it must deny the injunction.  Id.  If, however, the court finds that the movant passes the initial threshold, it then proceeds to the balancing phase of the analysis.  Id.

In the balancing phase, the court weighs the irreparable harm that the movant would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court granted the requested relief.  Id.  In doing so, the court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more

10

need it weigh in his favor." Id. (internal quotation marks omitted). Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest"). Id. The court's goal in conducting the balancing phase of the analysis is to minimize the cost of potential error: "the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose." Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 388 (7th Cir. 1984). The court must "try to avoid the error that is more costly in the circumstances." Id.

Starting with the threshold phase, I first consider whether plaintiff has shown that it will suffer irreparable harm prior to final resolution of its claims if a preliminary injunction does not issue. Plaintiff states that the denial of GSSF funding has significantly hindered its ability to convey its expressive message on campus. For the 2008-09 academic year, CFACT operated on a budget of $170,000. For 2009-10, CFACT applied for a GSSF budget of $163,671 but did not receive any of these funds due to defendants' challenged actions. CFACT alleges that without these funds it is "disabled from conducting its campaigns on environmental issues on campus and providing students with an alternative viewpoint to express on these critical issues." (Pl.'s Prop. Findings of Fact ¶ 112.) CFACT also notes that SSFC has demanded that it return any office equipment purchased with GSSF funds in the past, and that this will further hinder its ability to present its expressive message.

Defendants argue that the lack of GSSF funding has not resulted in the suppression of any of CFACT's speech because it continues to receive student-fee funding through

channels other than the GSSF and continues to receive other benefits available to RSOs. Available non-GSSF funding channels include operations grants, event grants and travel grants.  The purpose of operations grants is to fund the routine, day-to-day activities of RSOs.  Such grants cannot be awarded to RSOs that already receive GSSF funding.  For the 2009-10 academic year, CFACT received an operations grant of $8,300 (although it requested $47,810).  Defendants point out that CFACT could have applied for event and travel grants in order to supplement its operations grant, but it chose not to.  In addition to these various grants, CFACT continues to enjoy other benefits that the University extends to RSOs, including free office space and access to various services.[3]

Although the denial of GSSF funding has not eliminated plaintiff's ability to convey its expressive message, I conclude that plaintiff has shown that it will suffer irreparable harm if it does not obtain a preliminary injunction.  As noted, in prior years CFACT operated on a budget of $170,000, and it requested a similar amount for 2009-10.  Without a GSSF budget, however, its funding for 2009-10 is only $8,300.  This is a substantial decline in funding that will almost certainly impact its expressive activities.  Further, although CFACT continues to have access to private office space and office equipment that it shares with other RSOs, CFACT states that it is often very difficult to access the shared office equipment (such as computers) because of high demand, and that the

---

[3]As an RSO, CFACT receives the following benefits other than student-fee funding: an office suite in the Student Activity Center containing office furniture, a telephone and a telephone line (which CFACT can use free of charge); access to a common area containing computers, fully equipped kitchens, meeting rooms, study spaces, and furnished informal gathering spaces; access to a student printing center, which provides black-and-white and color copying and printing services, as well as design and fax services; and free access to a TV/VCR, a computer projector, and a viewing screen.

University has recently denied its application to keep its office space for the 2010-11 academic year.  Based on these facts I conclude that the loss of GSSF funding is interfering with CFACT's ability to exercise its First Amendment rights.  It therefore satisfies the threshold requirement of irreparable injury.  It follows that plaintiff also satisfies the second threshold requirement, lack of an adequate remedy at law.  See Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate . . . .").

The final threshold question is whether plaintiff has any likelihood of success on the merits.  To satisfy this requirement, CFACT must show that it has a "better than negligible" chance of success on the merits of at least one of its claims.  Girl Scouts of Manitou, 549 F.3d at 1096.  I find that plaintiff makes this showing and will explain my reasoning in more detail as part of the balancing phase of the analysis, to which I now turn.

The primary consideration in the balancing phase is the balance of irreparable harms.  I have already identified the irreparable harm that plaintiff would suffer if it does not obtain injunctive relief – namely, a reduction in its members' ability to engage in expressive activities on campus.  On the other side of the scale is the irreparable harm that defendants would suffer if I granted plaintiff an injunction.  Plaintiff argues that defendants would not suffer irreparable harm because an injunction would simply allow it access to the GSSF forum, which would impose no cost or burden on defendants.  However, if I ordered defendants to grant GSSF eligibility to CFACT for the remainder of the academic year, the University would have to pay some or all of CFACT's eligible expenses out of the GSSF fund.  The GSSF contains a finite amount of money, and thus any money it allocated to

13

CFACT could not be used to fund the expressive activities of other student groups.  If plaintiff ultimately loses this case on the merits, then a preliminary injunction would have imposed harm on defendants by diverting funds from eligible RSOs.  Further, such harm would be irreparable because CFACT has no assets other than the money it receives through the student-fee program and thus could neither post the security required by Federal Rule of Civil Procedure 65(c) nor reimburse the GSSF if it turned out that the injunction was improvidently granted.  See Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000) (stating that the inability to recover damages for an erroneously granted preliminary injunction constitutes irreparable harm).  Thus, if I mistakenly granted plaintiff an injunction, defendants would suffer irreparable harm by having lost the GSSF funds paid to CFACT pursuant to the injunction.[4]

The next step is to balance the irreparable harms, and I find that they are evenly balanced because each harm is the mirror image of the other.  Plaintiff's irreparable harm is the amount of its own speech that the requested GSSF funds would have facilitated.  Defendants' irreparable harm is the reduction in the amount of speech by other student groups that would be caused by the diversion of GSSF funds to CFACT.  Assuming that

---

[4]Plaintiff suggests that as an alternative to an injunction requiring that the University grant GSSF eligibility to CFACT, I could enter an injunction "ordering the Defendants to suspend their GSSF eligibility bylaws and reconsider CFACT's eligibility application based on viewpoint neutral standards." (Mot. for Prelim. Inj. ¶ 1a.) Plaintiffs point out that such an injunction would not harm defendants because it would not necessarily result in CFACT obtaining GSSF eligibility.  However, such an injunction would not be an appropriate remedy.  In its briefs, plaintiff does not argue that any GSSF bylaw is viewpoint discriminatory on its face.  Instead, it argues that the members of SSFC applied the bylaws in a discriminatory manner.  Thus, ordering the University to suspend its existing bylaws would be an overbroad remedy.  The appropriately tailored remedy would be to correct the alleged viewpoint discrimination by granting eligibility to CFACT.  For this reason, I do not consider plaintiff's alternative injunction to be a viable option.

each dollar of GSSF funding buys the same amount of speech regardless of the recipient, the irreparable harm on each side of the scale can be roughly quantified as the amount of GSSF funds at stake in this lawsuit.  Thus, the irreparable harms are evenly balanced.

Adding the public interest to the scale does not alter this balance.  The relevant nonparties are the other students at the University, and they would be harmed by an error in either direction.  If I do not grant the injunction and it turns out that I should have, then the students will have suffered irreparable harm because they will have been forced to fund a student-fee program that was partially operated in a viewpoint-discriminatory manner. See Southworth, 529 U.S. at 230 (holding that viewpoint-neutrality requirement protects the interests of students who object to the speech subsidized by a mandatory student-fee system).  If I grant the injunction and it turns out that I should not have, the students will suffer irreparable harm in the form of the GSSF funds diverted to CFACT, which could have been used to fund their own eligible speech.  Thus, the public interest does not favor either party.

Because a comparison of irreparable harms and consideration of the public interest results in an even balance, the sliding scale will favor plaintiff only if plaintiff's likelihood of success on the merits exceeds fifty percent.  However, as explained below, I find that plaintiff's likelihood of success is less than that.

To succeed on the merits of its claim, plaintiff must show that the University denied its application for GSSF eligibility on the basis of viewpoint.  To meet this burden, plaintiff argues that the University's decision must have been based on CFACT's viewpoint because it granted eligibility to WISPIRG, a group that engages in the same activities as CFACT but has a different viewpoint.  In making this argument, plaintiff relies on language

in the Seventh Circuit's decision in <u>Southworth</u>: "[I]f the SSFC or [other committees of student government responsible for allocating student fees] were to treat one RSO's speech and expressive activities as a student service, but conclude that another RSO's speech and expressive conduct did not constitute a student service, that would constitute proof of viewpoint discrimination." <u>Southworth v. Bd. of Regents of the Univ. of Wis. Sys.</u> 307 F.3d 566, 590 (7th Cir. 2002) ("<u>Southworth II</u>"). Plaintiff also relies on the court's statement that "if one RSO applied for funding following the blueprints of another RSO, i.e., similar organizational structure, similar types of activities, similar goals, and similar budgets, but received a lower amount of funding," such circumstances would constitute evidence of viewpoint discrimination. <u>Id.</u> at 591. Plaintiff argues that the present case falls within these statements because CFACT offered the same direct service as WISPIRG and applied for funding in accordance with the blueprints used by WISPIRG, yet the University decided to fund WISPIRG but not CFACT.

Although the seemingly disparate treatment of WISPIRG and CFACT is some evidence of viewpoint discrimination – and therefore gives CFACT a "better than negligible" chance of success on the merits – it is not enough to raise plaintiff's likelihood of success above fifty percent. This is so because the record reveals one major viewpoint-neutral difference between CFACT and WISPIRG: WISPIRG timely turned in a complete eligibility application, whereas CFACT did not. Plaintiff attempts to get around this difference by arguing that it did, in fact, timely turn in a complete application and that SSFC lost the missing pages. Plaintiff further argues that even if it did not timely submit a complete application, SSFC should have accepted its late submission of the missing pages because it accepted untimely application materials from other groups.

16

With respect to plaintiff's argument that it did timely turn in a complete application, I find that the relevant question is not whether it did, in fact, timely turn in a complete application but whether SSFC reasonably concluded that it did not.  In other words, the question is whether, in light of the evidence known to SSFC at the time it made its finding, did SSFC reasonably conclude that CFACT did not timely submit a complete application, or was SSFC's conclusion so unreasonable that it gives rise to an inference that the finding was simply a pretext for viewpoint discrimination.  Based on the preliminary injunction record, I conclude that it is unlikely plaintiff will be able to make the latter showing.  At the time SSFC made its finding, the members of the committee knew that pages were missing from CFACT's application and that CFACT members claimed that the application was complete when they turned it in.  They also knew that SSFC's chair could not confirm whether the application was complete when it was turned in.  Although SSFC could have reasonably concluded that CFACT had timely submitted a complete application and that SSFC staff misplaced the missing pages, it was also reasonable for SSFC to trust its administrative process and conclude that it was CFACT that failed to turn in the missing pages.  Thus, I find that plaintiff is unlikely to establish that SSFC's finding was the product of viewpoint discrimination.

Further supporting my conclusion that SSFC's finding regarding the completeness of CFACT's application was likely not based on viewpoint is the fact that there is no direct evidence of viewpoint discrimination in connection with the issue.  The only SSFC member who expressed disagreement with CFACT's viewpoint was Szarzynski, who ridiculed CFACT's views in a blog entry.  However, during the SSFC debate, Szarzynski urged the committee to give CFACT the benefit of the doubt and conclude that it had timely turned

in a complete application.  The SSFC members who voted against CFACT, Fergus and French, stated during the debate that they were concerned that if they found that CFACT had submitted a complete application they would be treating CFACT more favorably than another organization, which they had refused to fund because it had not timely submitted a complete application.  The record thus indicates that Fergus and French voted against CFACT because they wished to preserve viewpoint neutrality and equal treatment rather than to discriminate against CFACT because of its viewpoint.

Turning to plaintiff's argument that SSFC should have accepted CFACT's late submission of the missing pages on the ground that it had accepted late application materials from other groups, I find that plaintiff is unlikely to be able to prove that SSFC had, in fact, accepted late application materials from other groups.  In support of its claim, CFACT states that SSFC granted GSSF eligibility to groups that had failed to timely file their "students-served budget tracking forms," which are forms that groups were required to include with their GSSF-eligibility applications.  As evidence for this assertion, plaintiff relies on an allegation in its verified complaint stating that Lasowsky gave CFACT member James Hill a document purporting to list GSSF applicants that had not filed students-served budget tracking forms on time.  This document is attached to the complaint, and it lists a number of groups that supposedly did not submit the required form.

In response to this allegation, defendants submit the affidavit of SSFC's chair, Kurt Gosselin.  Gosselin states that he personally examined the file-stamped hard copies of all GSSF-eligibility applications that SSFC received in the fall of 2008, as well as all such applications received via email.  He states that his review revealed that each and every application considered in 2008 included a completed students-served budget tracking form.

18

Gosselin confirms this fact by attaching to his affidavit copies of the emails containing each group's application materials. A review of these emails reveals that every group submitted its students-served budget tracking form by August 18, 2008.

In its reply brief and supporting materials, CFACT does not dispute the accuracy of Gosselin's affidavit. It thus appears that CFACT concedes that SSFC did not accept incomplete GSSF application materials from groups other than CFACT in the fall of 2008. However, plaintiff raises a new factual argument in its reply brief – namely, that the minutes of the SSFC meting on September 29, 2008 suggest that SSFC agreed to accept WISPIRG's untimely application for "contract status."[5] (Reply Br. at 19-20.) Because plaintiff raised this factual argument for the first time in its reply brief and defendants have not had an opportunity to respond to it, I consider it waived for purposes of the present motion.[6] See, e.g., Gonzales v. Mize, 565 F.3d 373, 382 (7th Cir. 2009) (stating that arguments raised for the first time in a reply brief are waived).

Even if this argument were not waived, I note that the minutes of SSFC's September 29, 2008 meeting regarding WISPIRG's contract status do not contain enough information to enable me to conclude that it is likely that SSFC treated WISPIRG preferentially. The minutes state as follows:

> 12.1 WISPIRG Late Contract Status Request.
> Sec. Fergus stated that the status should be considered on its merits. He then stated that there were extenuating circumstances and the contract was sent in within 10 days, as well as WISPIRG not having turned in a late

---

[5]An RSO that receives contract status is authorized to use student fees to hire non-student employees.

[6]My finding of waiver applies only to the present motion. Plaintiff is free to pursue this factual argument in discovery and at trial, if necessary.

> application in the past two years.  Rep. Lasowsky agreed.  Sec. Fergus
> moved to accept the late contract status request.  Question called.

(Gosselin Aff. Ex. 9 at 3.)  As the above excerpt reveals, the minutes to do not indicate that

SSFC voted to accept WISPIRG's untimely application.  Rather, they indicate that two

members, Fergus and Lasowsky, thought that extenuating circumstances justified

WISPIRG's failure to submit its application on time, and that Fergus moved to accept the

late application.  Although the minutes state that the question was called, which suggests

that the committee voted on the matter, the minutes do not include the outcome of the

vote, and thus it is not clear whether the committee voted to accept the application.  (I note

that the minutes reveal the outcome of all other votes after the question was called.)

Further, the minutes do not reveal what "extenuating circumstances" caused Fergus and

Lasowsky to conclude that SSFC should accept WISPIRG's untimely application, and thus

I lack the context necessary to determine whether CFACT's circumstances were sufficiently

similar to WISPIRG's such that CFACT should have been allowed to submit untimely

application materials.  On this record, then, I am unable to find that SSFC's handling of

WISPIRG's request for contract status constitutes evidence that SSFC discriminated

against CFACT based on viewpoint.

At trial, if plaintiff is unable to show that SSFC's decision to reject its untimely

application materials was motivated by viewpoint, it will almost certainly be unable to show

that it was treated less favorably than WISPIRG, inasmuch as CFACT's failure to timely

submit a complete application would be a viewpoint-neutral justification for denying

eligibility to CFACT but granting it to WISPIRG despite the similarity of the two groups'

direct services.  For the reasons explained above, I conclude that plaintiff is unlikely to

show that SSFC's findings regarding the completeness of CFACT's application were based on viewpoint, and therefore I conclude that plaintiff has only a small chance of success on the merits.

### III.  CONCLUSION

Because the parties' respective irreparable harms and the public interest are evenly balanced and it is more likely than not that defendants will prevail on the merits, the sliding scale tips in favor of defendants.  I thus conclude that the cost of erroneously granting a preliminary injunction is greater than the cost of erroneously denying such an injunction. Minimizing the cost of potential error, I hereby **DENY** plaintiff's motion for a preliminary injunction.  As an administrative matter, I also **GRANT** defendants' motion to file an oversize brief.

Dated at Milwaukee, Wisconsin, this 9 day of March, 2010.


/s_____
LYNN ADELMAN
District Judge

21